CHAS. A. TAIT v. THE STATE.

No. 7915. Decided March 26, 1924.

1.—Murder—Manslaughter—Charge of Court—Cooling Time.

Where, upon trial of murder, there was evidence on the theory of cooling time which required a charge on manslaughter, and an exception was reserved to its omission, the same constitutes reversible error. Following· Hobbs v. State, 16 Texas Crim. App., 522, and other cases.

2.—Same—Self-Defense—Manslaughter—Charge of Court..

If the defendant first fired in self-defense but under the excitement of the moment fired again after the danger, real or apparent, had passed, the state of his mind at the time he fired the second shot was an inquiry for the jury, and the court's charge that if such second shot contributed to the death of the deceased, it would not be justifiable but unlawful, and it might, under the law of cooling time, have been unlawful but still not murder, the law of manslaughter should have been submitted.

**3.—Same—Manslaughter—Rule Stated.**

It is a settled practice in this State that when the trial court is in doubt touching the sufficiency of the evidence of adequate cause, and the state of mind of the accused, a charge on manslaughter should be given. Following   Lewis v. State, 89 Texas Crim. Rep., 345, and other cases.

**4.—Same—Evidence—Res Gestae.**

The declarations of the deceased were properly received in evidence under the rule of res gestae.

**5.—Same—Defense of Property—Charge of Court.**

The court did not err in refusing to charge on the law pertaining to the defense of property.

Appeal from the District Court of Grayson.    Tried below before the Honorable Silas Hare.

Appeal from a conviction of murder; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Randell & Randell,* and *Head, Dillard, Smith, Maxey & Head,* for appellant. Cited cases in opinion.

*Tom Garrard,* Attorney for the State, and *Grover C. Morris,* Assistant Attorney for the State.

MORROW, PRESIDING JUDGE.—The offense is murder; punishment fixed at confinement in the penitentiary for a period of five years.

Appellant shot and killed his half-brother, Pearl Rudasill. Appellant's mother had been married twice, and he was the offspring of the first marriage. There were three sons by the second marriage. Mrs. Rudasill and her husband, Emanuel Rudasill, were separated. A suit for divorce had been filed and the rights to property in 363 acres of land put in issue and awarded to Mrs. Rudasill as her separate property. An injunction had been issued against her husband and his sons forbidding their entering upon the land without the permission of Mrs. Rudasill. The deceased and his full brothers—the Rudasill boys—were partisans of their father in the controversy. Appellant sided with his mother. The mother of the appellant resided at his home where the homicide took place. The deceased, for a short time after the separation, resided with his mother, but sometime before the homicide, removed to his father's place. After his removal, he had not spoken to the appellant. The deceased, it seems, had, previous to the homicide, gone onto the premises contrary to the injunction, and had been warned in writing by the attorney for Mrs. Rudasill to refrain from repeating this conduct under threat of a contempt proceeding before the court.

Evidence for the appellant was in substance this: While sitting and

reading in one of the rooms, appellant observed the deceased riding horseback and entering the premises through a gate some fifty yards distant. He got his shotgun from a closet, stepped onto the porch, and hollered at the deceased to go back. If the deceased heard the remark, he did not heed it, but took the reins in his left hand and urged his horse forward. Appellant repeated the words, "Pearl, go back," and said: "Pearl, you go back, or I will hurt you." Deceased said: "You are not game enough to shoot; by God, I can shoot too." His right arm could not be seen by appellant on account of the horse's head, but from the motion of the shoulder of deceased appellant believed that he was going to shoot and fired twice. Before firing, he heard his mother say: "Oh, Pearl, don't shoot." Appellant got his gun in order that he might protect himself and to prevent trouble, believing that if his brother knew he was armed, he would go away.

Appellant's mother testified that while she was sitting near a window and reading a paper, she saw some one approaching and asked the appellant who it was; that he replied that it was Pearl. Appellant then got his gun, walked on the porch and told Pearl to go back. She heard no reply, but heard the appellant repeat three times, "Pearl, go back." She did not see the deceased at the time he was shot, but shortly before she saw him as he trotted his horse towards the house and throw his hand back; that she then remarked, "Oh, Pearl, don't shoot."

The State introduced the declaration of the deceased to the effect that he was unarmed; that when the appellant told him to go back, he turned around to go back and was shot. Buckshot were used. Two shots were fired about one minute apart. Appellant said:

"When I fired the first shot, I didn't know whether I hit him or not. I could not say whether before I fired the second shot the mare had wheeled around and Pearl had his side to me. . . . I could not say what time elapsed between the first and second shots. . . . I shot as quick as I could cock the gun and shoot again. I thought probably I had missed him the first shot; I didn't know but that I missed him both shots."

In connection with the law of self-defense, the learned trial judge embraced in his charge this paragraph:

"On the other hand, if you find and believe from the evidence that the defendant shot the deceased at the beginning of the difficulty as a means of self-defense, or as a means of defending himself against real or apparent danger, viewed from his standpoint, but you further find and believe from the evidence, beyond a reasonable doubt, that the defendant shot after all danger to the defendant had ceased, and all appearance of danger had ceased, viewed from defendant's standpoint, and you further find and believe from the evidence, beyond a reasonable doubt, that such shot so fired, if any, after all danger, real or apparent, had passed, caused or contributed to cause the death of

the deceased, then you are instructed that such killing would not be done in his self-defense, but would be unlawful.''

He also gave the conventional charge on the right to continue to shoot as long as the danger appeared. There was no charge on the law of manslaughter. An exception was reserved to its omission, and the matter is brought before this court for review. It is not believed that the paragraph of the charge quoted was without evidence to support it, but we do express the opinion that the issue being in the case, the court should have charged on the law of manslaughter upon the theory of cooling time. Hobbs v. State, 16 Texas Crim. App., 522; Lagrone v. State, 84 Texas Crim. Rep., 612; Anderson v. State, 37 Texas Crim. Rep., 242, 221 S. W. Rep., 285.

If the appellant first fired in self-defense but under the excitement of the moment fired again after the danger real or apparent, had passed, the state of his mind at the time he fired the second shot was an inquiry for the jury. The court, in the paragraph of the charge quoted, informed the jury that if the second shot was fired after the appearance of the danger had ceased, viewed from appellant's standpoint, and such shot contributed to the death of the deceased, it was not justifiable but unlawful. It might under the law of cooling time have been unlawful but still not murder. The reason, under the evidence, for instructing the jury on the law of manslaughter with reference to the second shot, cannot be better stated than by Judge Willson in the Hobbs case, supra.

The jury may have believed that the appellant exaggerated the danger and that he being in full possession of his faculties and his mind uninfluenced by passion, should have refrained from firing the first shot. It cannot be said with certainty that the facts known to the appellant leading up to the moment of the conflict were not adequate to render his mind incapable of cool reflection. The relations between the deceased and the appellant were unfriendly. Deceased had been forbidden by mandate of the court to come upon the premises without the permission of his mother. There was evidence that he had disobeyed this command and had been warned not to repeat the transgression. There was also evidence that the appellant, as the deceased approached, warned him to refrain from coming further. There was the exclamation of the old mother, ''Oh don't shoot, Pearl'', which was heard by the appellant. There was the resentment at the conduct of the deceased and the apprehension aroused by his manner of approach. Taking these matters into account, we are not prepared to say that there was no evidence which demanded an instruction to the jury to determine whether in firing the first shot at the deceased, the appellant's mind was not controlled by the passion of anger, rage or terror, and thereby rendered incapable of cool reflection. It is a settled practice that when the trial court is in doubt touching the sufficiency of the evidence of adequate cause,

and the state of mind of the accused, a charge on manslaughter should be given. Arnwine v. State, 49 Texas Crim. Rep., 5; Thompson v. State, 24 Texas Crim. Rep., 383; Steen v. State, 88 Texas Crim. Rep., 256; Lewis v. State, 89 Texas Crim. Rep., 345.

The declarations of the deceased were, we think, properly received under the rule of res gestae.

The court did not err in refusing to charge on the law pertaining to the defense of property.

The judgment is reversed and the cause remanded.

*Reversed & remanded.*